UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

CALEB ALEXANDER RANNEY,

Defendant.

Case No. 25-cr-00416-TSH-1

**ORDER RE:  MOTION TO SUPPRESS**

Re: Dkt. No. 39

## I.    INTRODUCTION

The United States Attorney's Office (the "Government") charged Defendant Caleb Alexander Ranney with two criminal offenses:  (1) Assault on a Federal Officer (violation of 18 U.S.C. § 111(a)(1)); and (2) Destruction of Government Property (violation of 18 U.S.C. § 1361). ECF No. 1.  The case is set to proceed to jury trial on July 27, 2026.  ECF No. 21.  Pending before the Court is Ranney's Motion to Suppress.  ECF No. 39 ("Mot.").  Having considered the parties' arguments, the Court rules as follows.

## II.    BACKGROUND

### A.    Factual Background

This case arises out of events that took place on August 8, 2025, where Ranney "attended a pro-immigration rights protest in San Francisco."  Mot. at 1:2; *see* Opp. at 1:13–18 (ECF No. 46). The protest occurred at a federal building where Immigration, Customs, and Enforcement ("ICE") have offices.  Mot. at 1:2–5; Opp. at 1:13–19.  Ranney "was arrested at that protest and ultimately

cited and released." Mot. at 1:5; *see* Opp. at 3:17–19.

The parties submit video evidence of the events relevant to this Motion. The Government asserts that a video shows the following. Opp. at 1:20–3:21; *see* Declaration of Eli J. Cohen ("Cohen Decl.") (ECF No. 46-1), Ex. A (Westside Outside Sallyport video) (ECF No. 46-2). At the protest, Ranney was wearing "dark clothing, a black balaclava-style mask and keffiyeh head scarf, black hard-knuckle gloves, boots, and a backpack." Opp. at 1:25–26 (citing Cohen Decl., Ex. A at 01:44–02:23). After officers closed a sallyport garage door, Ranney kicked and shoved the door; he "delivered two kicks and approximately four shoves with his body weight." *Id.* at 1:23–2:21 (citing Cohen Decl., Ex. A at 02:44–03:19); *see also* Cohen Decl., Exs. E (ECF No. 46-6), F (ECF No. 46-7) (photographs of incident). When ICE officers exited the building, Ranney "charged at" one officer and "shoved the officer with both hands, forcing him to step backward." Opp. at 3:1–17 (citing Cohen Decl., Ex. A at 03:48–03:59); *see also* Cohen Decl., Exs. G at 00:00–00:26 (Sally Port North video) (ECF No. 46-8), H (ECF No. 46-9), I (ECF No. 46-10), J (ECF No. 46-11) (photographs of incident). Officers then took Ranney into custody and handcuffed him. Opp. at 3:18–21 (citing Cohen Decl., Exs. A at 03:59–06:56, G at 00:30–01:12).

The parties agree on the following events. After the encounter between Ranney and the officers, Ranney was transported by officers inside the building to a holding area. Mot. at 2:1–8; Opp. at 3:18–23. Once inside the building, an officer removed the balaclava from Ranney's head, another officer removed the backpack from Ranney's back, and an officer had Ranney remove his gloves and hand them to an officer. Mot. at 2:9–16; Opp. at 3:23–25. An officer then took Ranney's backpack into a different room and placed it on a table. Mot. at 2:17–3:8; Opp. at 3:26–27. Officers searched Ranney's backpack in the different room. Mot. at 3:3–5:26; Opp. at 3:27–28. Officers separated certain items in Ranney's backpack—cans of spray paint and tools (pliers or wire cutters)—from the rest of his property and photographed the separate property. Mot. at 11:14–21; Opp. at 4:1–4; *see* Declaration of Samantha Jaffe ("Jaffe Decl.") (ECF No. 33), Ex. E (photographs) (ECF No. 33-5). The officers also took pictures of Ranney's gloves. Mot. at 5:24–26; Opp. at 4:1–4; *see* Jaffe Decl., Ex. E. Officers seized the spray paint, tools, and gloves by placing them in a brown paper bag and taking the bag outside the building. Mot. at 5:1–6:3; Opp.

2

at 4:1–4. No inventory was produced from the search. Mot. at 11:14; Opp. at 9:5. The items taken from Ranney's backpack, along with his gloves, were lost. Mot. at 11:14–21; Opp. at 10:21–22.

Ranney asserts that three videos show the following regarding the officers' initial search of his person and subsequent search of his backpack. Mot. at 2:1–16; *see* Jaffe Decl., Exs. A (ECF No. 33-1), B (ECF No. 33-2), C (ECF No. 33-3). Ranney was taken inside the building and placed against a wall, with his face against the wall. Mot. at 2:1–8 (citing Jaffe Decl., Ex. A at 00:05–01:28). When officers searched his person, the officers removed various items, placing some on a table and others in the trash. *Id.* (citing Jaffe Decl., Ex. A at 00:05–02:42). Officers searched Ranney's backpack in a common area after removing it from Ranney. *Id.* at 13:11–13 (citing Jaffe Decl., Ex. B at 04:54–06:27). When officers removed Ranney's backpack, Ranney was "in a hallway surrounded by several armed ICE agents, some of whom were holding him by the arm or shoulder." *Id.* at 13:13–15 (citing Jaffe Decl., Ex. A at 00:05–05:09). Officers initially searched Ranney's backpack for several minutes. *Id.* at 3:3–5:15, 14:4–6 (citing Jaffe Decl., Ex. B at 05:03–08:24). The officer who removed items from the backpack did not wear gloves. *Id.* at 4:9–10 (citing Jaffe Decl., Ex. C at 00:09–02:20). The contents of the backpack were left on a table for almost two hours. *Id.* at 3:3–5:15, 14:4–6 (citing Jaffe Decl., Ex. C at 00:09–1:50:11). During that time period, the contents were left unattended at times, and multiple officers entered and exited the room. *Id.* at 3:17–4:5 (citing Jaffe Decl., Exs. B at 08:24–15:00, C at 02:25–20:40, 1:38:45–1:47:20). At one point, officers took photos of what appeared to be an ID while the ID was on the table next to Ranney's property. *Id.* at 4:15–17 (citing Jaffee Decl., Ex. C at 14:22–20:54). An officer then began filling out citation forms. *Id.* at 4:18–24 (citing Jaffe Decl., Ex. C at 15:23–20:54).

Ranney also proffers the following evidence. First, he submits the "National Detention Standards" ("NDS") that govern ICE policies related to detention. Mot. at 7 n.4; *see* Jaffee Decl., Ex. I (NDS) (ECF No. 33-9). Standard 2.1 states that "[e]ach new arrival will be searched," and

> [a]ll items discovered during the search will be categorized as funds, valuables, or other personal property, to be retained by the detainee or inventoried, receipted, and stored. Items classified as contraband

3

> will be handled appropriately, in accordance with Standard 2.4 'Funds and Personal Property,' and Standard 2.3 'Facility Security and Control.'

NDS at 27. Standard 2.4 states that "[f]acilities shall provide for the control and safeguarding of detainee personal property." *Id.* at 37. It further states, in pertinent part:

> The facility shall provide a secure area, accessible only by designated supervisors and/or property officers, to hold detainee property, valuables, and foreign currency. . . . Any unauthorized personal property is contraband and will be surrendered to staff for securing and inventorying.

*Id.* And the standard also states:

> Facilities shall establish a written procedure for the inventory and audit of detainee funds, valuables, and personal property. For recordkeeping and accounting purposes, use of the G-589 *Property Receipt* or an equivalent form is mandatory to document any funds removed from a detainee's possession, including the amount and type of currency. Detainees must be provided with a receipt for all property held until release.

*Id.* at 38. Second, Ranney submits emails from the Government regarding the search and seizure of his property. Mot. at 6:4–7:1; *see* Jaffe Decl., Ex. H (Combined Property Emails) (ECF No. 33-8). The email responses do not provide information about Ranney's missing property. Jaffe Decl., Ex. H. Ranney asserts that some of the agents' responses, claiming no knowledge of any search or seizure associated with Ranney, conflict with the video evidence showing the agents' presence at these events. Mot. at 6:4–7:1 (citing Jaffe Decl., Exs. C at 14:22–1:52:16, F (ECF No. 33-6), G (ECF No. 33-7), H). Finally, in his Reply, Ranney submits excerpts from witness interviews. Reply at 2:16–25; *see* Reply Declaration of Samantha Jaffe ("Jaffe Reply Decl.") (ECF No. 52), Ex. K (Excerpted Witness Interview Notes) (ECF No. 52-2). The excerpts contain agent interview notes; one agent stated that he did not think that the items taken from Ranney at his arrest "are evidence, or he would have logged them as evidence." Jaffe Reply Decl., Ex. K at 7.

## B.    Procedural Background

On December 5, 2025, the Government filed an Information charging Ranney with Assault on a Federal Officer (Count 1), alleging Ranney

> forcibly assaulted, resisted, opposed, impeded, intimidated, and

4

> interfered with a person designated in 18 U.S.C. § 1114, to wit: Immigration and Customs Enforcement Deportation Officer Victim One, an officer and employee of the United States and of any agency in any branch of the United States Government, while he was engaged in and on account of his performance of official duties, all in violation of Title 18, United States Code, Section 111(a)(1).

ECF No. 1. The Government also charged Ranney with Destruction of Government Property (Count 2), alleging Ranney

> willfully injured and committed a depredation against property of the United States and of any department and agency thereof, specifically a sally port located on the Jackson Street side of the building at 630 Sansome Street in San Francisco, California, causing damage in an amount less than $1,000, all in violation of Title 18, United States Code, Section 1361.

*Id.* The Government alleges that Ranney committed these two offenses "[o]n or about August 8, 2025, in the Northern District of California." *Id.* On December 19, 2025, Ranney was arraigned and entered a plea of not guilty on both Counts of the Information. ECF No. 2.

In preparation for the upcoming trial, Ranney filed a Motion to Suppress on June 24, 2026.[1] ECF No. 39 ("Mot."). On July 1, 2026, the Government filed an Opposition. ECF No. 46 ("Opp."). On July 5, 2026, Ranney filed a Reply.[2] ECF No. 51 ("Reply").

### III.   LEGAL STANDARD

Under the Federal Rules of Criminal Procedure, suppression of evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be

---

[1] Ranney filed his Motion to Suppress on June 24, 2026. *See* ECF No. 32. On June 30, 2026, Ranney filed a corrected Motion to Suppress which the Court treats as Ranney's operative Motion. *See* ECF No. 39.

[2] Ranney also filed a request to permit filing of an oversized reply brief. ECF No. 53. However, pages 13–18 of Ranney's Reply went off track and are a discussion of his Motion *In Limine* 6, but the motions *in limine* are supposed to be addressed in separate briefing. As such, the Court **DENIES** Ranney's request to file an oversized reply brief and considers only the first fifteen pages of Ranney's Reply for this Motion.

On July 6, 2026, the Government filed a Motion to File Sur-Reply, asserting that in his Reply, Ranney "raises points of law regarding the propriety of law enforcement searching a backpack incident to arrest which were not cited in his original motion." ECF No. 61. Ranney filed a response to this motion on July 8, 2026, asserting that his Reply, like his Motion to Suppress, focuses on the search incident to arrest exception and the inventory search exception. ECF No. 62. The Court agrees with Ranney that he does not raise new points of law in his Reply. Therefore, the Court **DENIES** the Government's Motion to File Sur-Reply.

determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(C). Pursuant to Rule 12:

> The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. The court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal. When factual issues are involved in deciding a motion, the court must state its essential findings on the record.

*Id.* at 12(d).

"An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in issue."[3] *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986). "Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court." *United States v. Wardlow*, 951 F.2d 1115, 1116 (9th Cir. 1991) (citation omitted).

## IV. DISCUSSION

Ranney moves to suppress "all evidence obtained as a result of the seizure and search of his person and property, including photographs of [his] backpack and the items found on his person and inside of the backpack," because the seizure and search violated the Fourth Amendment. Mot. at 7:2–8:17.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014) (cleaned up). Thus, "the Fourth Amendment prohibits only searches that are unreasonable." *Chatrie v. United States*, No. 25-112, 609 U.S. –, 2026 WL 1855568, at *16 (June 29, 2026). Likewise, the Fourth Amendment prohibits only

---

[3] As a threshold issue, Ranney requests the Court "hold an evidentiary hearing on all contested issues of fact." Mot. at 16:6–8. The Government responds that "there is no contested issue of material fact," as the "circumstances of the searches and seizures at issue are all on video, and Ranney has not submitted any affidavits or declarations that present a contested issue of material fact." Opp. at 11:18. The Court agrees that because of the available video evidence, and that the parties largely agree on the facts for purposes of this Motion, there are no material facts that are subject to reasonable dispute. Therefore, the Court concludes that an evidentiary hearing is not required.

6

seizures that are unreasonable.  *Torres v. Madrid*, 592 U.S. 306, 309 (2021).

"The gravamen of a Fourth Amendment claim is that the complainant's legitimate expectation of privacy has been violated by an illegal search or seizure."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  In other words, the Fourth Amendment only applies where the complainant has a reasonable expectation of privacy.  A Fourth Amendment search occurs "[w]hen an individual seeks to preserve something as private and his expectation of privacy is one that society is prepared to recognize as reasonable," and the governmental intrudes "into that private sphere."  *Chatrie*, 2026 WL 1855568, at *8 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)).  A Fourth Amendment seizure of a person "can take the form of physical force or a show of authority that in some way restrains the liberty of the person."  *Torres*, 592 U.S. at 311 (cleaned up).  The "arrest of a person is quintessentially a seizure."  *Payton v. New York*, 445 U.S. 573, 585 (1980) (cleaned up).  Finally, a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property."  *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) (citation omitted).

If a complainant establishes a reasonable expectation of privacy, the next question is whether a search or seizure is reasonable in its inception and scope.  *Terry v. Ohio*, 392 U.S. 1, 17–19 (1968).  In general, warrantless searches and seizures are *per se* unreasonable.  *Katz*, 389 U.S. at 357; *see Chimel v. California*, 395 U.S. 752, 762 (1969) ("police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure"); *Payton*, 445 U.S. at 585 ("Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment.").  As such, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Riley*, 573 U.S. at 382.  "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government."  *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012).

Here, the Government does not dispute that Ranney has a reasonable expectation of privacy in his person and in his backpack.  Mot. at 7:3–6; *see generally* Opp.  And it is undisputed that the search and seizure of Ranney and his backpack were conducted without a warrant.  Mot. at

United States District Court
Northern District of California

1:16–17; Opp. at 5:13–23.  Therefore, the question is whether the Government establishes by a preponderance of evidence that the warrantless search and seizure were nonetheless reasonable. *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The government must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of the evidence.").

## A.      Search

Ranney argues that the search of his backpack was unconstitutional.  Mot. at 9:21–14:10. The Government contends that the "search of [Ranney's] backpack, and subsequent photographing and seizure of certain items, was justified as a search incident to arrest and was the inevitable result of an inventory search."  Opp. at 4:6–14.

Here, the Court finds that the Government fails to meet its burden in showing that the warrantless search of Ranney's backpack falls within any exception to the Fourth Amendment's warrant requirement.

Accordingly, the Court concludes that the search of Ranney's backpack was unconstitutional in violation of the Fourth Amendment.

### 1.      Search Incident To Arrest

Ranney argues that the search incident to arrest exception does not apply because (1) he "was detained in custody, but was not actually booked in or processed to be held longer than temporarily"; and (2) "the backpack was outside of [his] immediate control when it was searched." Mot. at 12:4–14:10.

"It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."  *United States v. Robinson*, 414 U.S. 218, 224 (1973).  The justification for this exception is two-fold:  "to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape" and to seize any evidence "in order to prevent its concealment or destruction."  *Chimel*, 395 U.S. at 762–63.  The exception thus applies to "the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."  *Id.* at 763.  In the absence of a search warrant, there must exist some constitutional

8

justification for extending the search beyond this area. *Id.* at 768.

Although the existence of the search incident to lawful arrest exception for warrantless searches "has been recognized for a century, its scope has been debated for nearly as long." *Riley*, 573 U.S. at 382. "That debate has focused on the extent to which officers may search property found on or near the arrestee." *Id.* In determining whether a search of an arrestee's property is reasonable, a court must inquire "whether application of the search incident to arrest doctrine to this particular category of effects would untether the rule from the justifications underlying the *Chimel* exception." *Id.* at 386 (cleaned up).

Here, the first question is whether the search of Ranney's backpack was associated with his lawful arrest. In passing, Ranney states that "[a]bsent an arrest, the 'search incident to arrest' exception does not apply." Mot. at 12:6–10. Ranney seemingly argues that he was not arrested. *See id.* at 13:9–11 ("even assuming that [Ranney] was actually arrested"). The Government responds that Ranney was "arrested within the Ninth Circuit's understanding of the term." Opp. at 7:11–27. Ranney agrees that video evidence shows that Ranney was taken to the ground by officers and placed in handcuffs. *Id.* at 7:20–22; *see* Cohen Decl., Exs. A at 03:59–06:56, G at 00:30–01:12; Reply at 3:5–13. And the parties agree that after this encounter, Ranney was transported to a holding area. Mot. at 2:1–8; Opp. at 3:18–23. An arrest "occurs when a law enforcement officer, through coercion, physical force, or a show of authority, in some way restricts the liberty of a person." *Hopkins v. Bonvicino*, 573 F.3d 752, 773 (9th Cir. 2009) (cleaned up). The use of physical force to restrain Ranney and the restriction of his movement by taking him inside the building clearly meet this definition of arrest. Moreover, Ranney refers to his "arrest" in his Motion. *See* Mot. at 1:5 ("Ranney was arrested at that protest and ultimately cited and released."), 1:21 ("After [Ranney's] arrest . . . ."), 6:25–7:1 ("[Ranney] was rather processed for a citation from the point of his arrest onwards."). Therefore, the evidence shows that Ranney was subjected to a seizure of his person through arrest. *Payton*, 445 U.S. at 585. Because Ranney does not challenge the lawfulness of any arrest that occurred, the Court presumes for the purposes of this Motion that Ranney's arrest was lawful.

The next question is whether the search of Ranney's backpack was reasonable such that it

falls within the search incident to arrest exception. The Court concludes that it was not. First, it is undisputed that officers removed Ranney's backpack from his back and took the backpack to another room to search it while Ranney was detained. Mot. at 2:17–5:26, 13:9–26; Opp. at 3:26–28. This shows that at the time the search occurred, Ranney's backpack was not within his reach and thus not within his immediate control. *Chimel*, 395 U.S. at 763; *see* Reply at 4:9–22. Second, in looking at the particular category of effects—backpacks separated from arrestees by an entire room while the arrestee is detained—it is clear that the search was not tethered to the exception's twin aims of officer protection and evidence preservation. *Riley*, 573 U.S. at 386. The Government argues that the search is justified if it was not so separated in time or by intervening acts from the arrest. Opp. at 8:7–20. It is true that "unknown physical objects may always pose risks, no matter how slight, during the tense atmosphere of a custodial arrest." *Riley*, 573 U.S. at 387. But Ranney's backpack was searched *after* his arrest took place, in a room completely separate from where Ranney was restrained. So there was no danger of Ranney using any weapons or destroying any evidence present in his backpack "unless he possessed the skill of Houdini and the strength of Hercules." Mot. at 13:9–26 (quoting *United States v. Caseres*, 533 F.3d 1064, 1072 (9th Cir. 2008)). Further, the arrest and search were separated "by a string of intervening events that signaled that the exigencies of the situation had dissipated." *Caseres*, 533 F.3d at 1074. Importantly, video evidence shows that officers subdued Ranney outside, handcuffed him, brought him inside the building, had him stand facing a wall, surrounded him with armed ICE agents, removed his backpack, took the backpack to another room, and *then* searched the backpack. Cohen Decl., Exs. A at 03:59–06:56, G at 00:30–01:12; Jaffe Decl., Exs. A at 00:05–05:09, B at 04:54–06:27; Mot. at 2:1–8; Opp. at 3:18–23; Reply at 6:23–28. This shows that the search was too far removed in time from the arrest to fall within the exception. *See* Reply at 4:23–6:28.

The Court agrees with Ranney that the Ninth Circuit's analysis in *United States v. Cook* bolsters the conclusion that the search incident to arrest exception is not met here. Mot. at 13:3–14:10 (citing 808 F.3d 1195 (9th Cir. 2015)). In *Cook*, the Ninth Circuit held that the exception applied where the search "occurred immediately after [the officer] arrived on the scene, as [the

10

arrestee] was being taken into custody," the arrestee's "backpack was right next to him" when the search occurred, the search lasted "twenty to thirty seconds," and "as soon as [the officer] determined that the backpack contained no weapons, he immediately stopped the search." *Cook*, 808 F.3d at 1199–1200. In contrast, here, the video evidence shows that Ranney had already been arrested and taken inside prior to the search, Ranney's backpack was not next to him during the search, the initial search lasted several minutes, and the contents of the backpack were left on a table for almost two hours after the search. Mot. at 3:3–5:26, 14:4–10; Opp. at 3:26–28; Jaffe Decl., Exs. B at 05:03–08:24, C at 00:09–1:50:11. Therefore, the factors present in *Cook*—"[t]he brief and limited nature of the search, its immediacy to the time of arrest, and the location of the backpack"—are not present here. *Cook*, 808 F.3d at 1200.

The Government's reliance on *United States v. Tarazon* and *United States v. Turner* is misplaced. Opp. at 6:4–19, 7:26–8:6 (citing 989 F.2d 1045 (9th Cir. 1993) and 926 F.2d 883 (9th Cir. 1991)). The Government cites these cases for the proposition that there is not a *per se* requirement for a search incident to an arrest that the area be within the arrestee's control during the time of the search, as long as the area was within his control at the time of the arrest. In *Turner*, for example, the arrestee had been removed to a different room from the one in which he was arrested, which was then searched. 926 F.2d at 887–88. But those cases do not help the Government. *Turner* reiterated that "a search incident to arrest must be conducted at about the same time as the arrest," *id*. at 887 (cleaned up), and limited its holding "to the narrow facts of a short time span and the arrestee's close proximity." *Id*. at 888 n.2. Similarly, in *Tarazon*, "the search occurred only moments after the arrest." 989 F.2d at 1051. As explained, Ranney was subdued and handcuffed outside the building on the pavement. Officers then brought him into the building, took him up an elevator to the sixth floor of the building, stood him in front of a wall, surrounded him with armed ICE agents, removed his backpack, took the backpack to another room, and then searched the backpack. Here, the arrest and the search are too distant from each other in both time and space and too much happened in between.

Accordingly, the Court concludes that the Government fails to show that the warrantless search of Ranney's backpack falls within the search incident to lawful arrest exception.

11

### 2.      Inventory Search

Ranney argues that the inventory search exception does not apply because (1) Ranney "was only processed for a citation and release"; and (2) "the purpose of the search was investigatory in nature."  Mot. at 10:6–12:3.

The "inventory search constitutes a well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983).  "The justification for such searches does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search."  *Id.*  Instead, an inventory search is justified because it "deters false claims," "inhibits theft or careless handling of articles taken from the arrested person," and preserves "the security of the stationhouse."  *Id.* at 646, 648.  Therefore, "[a]t the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."  *Id.* at 646.

Under the inventory search exception, "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."  *Id.* at 648.  However, "*the existence* of an inventory policy or practice is not itself sufficient to justify applying the inventory-search exception."  *United States v. Anderson*, 101 F.4th 586, 593 (9th Cir. 2024) (emphasis in original).  An "officer's degree of compliance with the governing procedure is relevant in determining whether the officer acted in furtherance of administrative purposes or solely for investigatory purposes under the guise of conducting an inventory."  *Id.* at 594.  At bottom, "[t]o satisfy the Fourth Amendment, an inventory search must serve administrative, not solely investigatory, goals."  *Id.* at 600.

"Where a defendant challenges law enforcement's motivations for conducting an inventory search, the defendant must point to objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme."  *Id.* at 594 (cleaned up).  "[W]hen a defendant produces objective evidence of pretext, the court must assess the officers' subjective intent to determine whether the requirements of the inventory-search exception are met."  *Id.*

United States District Court
Northern District of California

Here, the Court finds that Ranney points to objective evidence demonstrating that the search of his backpack did not serve administrative goals. First, it is undisputed that no inventory was produced from the search. Mot. at 11:14; Opp. at 9:5. The Government argues that the fact that the searching officers failed to produce an inventory is not dispositive. Opp. at 9:5–18. Fair enough. *See Anderson*, 101 F.4th at 596 ("an incomplete inventory form is not *inherently* fatal") (emphasis in original). But this fact is relevant, as the "purpose of an inventory search is *to produce an inventory* of the items." *Id.* at 595 (emphasis in original) (cleaned up). Second, Ranney proffers evidence showing that "ICE did not comply with its stated inventory search procedures." Mot. at 10:28–11:21. Per ICE policy, officers are required to inventory, receipt, and store all personal property of a detainee that is removed from the detainee, and to hold that property in a "secure area, accessible only by designated supervisors and/or property officers." NDS at 27, 37. But here, video evidence shows that Ranney's items were left in a common area where multiple officers entered and exited; in addition, no inventory was completed. Jaffe Decl., Exs. B at 04:54–06:27, 08:24–15:00, C at 02:25–20:40, 1:38:45–1:47:20; Mot. at 11:14; Opp. at 9:5. And the Government does not dispute that ICE policies were not followed. Third, it is undisputed that several items taken from the search of Ranney's backpack were lost. Mot. at 11:14–21; Opp. at 10:21–22. Losing items is clearly incompatible with a purpose of an inventory search, to inhibit "theft or careless handling of articles taken from the arrested person." *Lafayette*, 462 U.S. at 646, 648. Fourth, there is no dispute that officers separated certain items in Ranney's backpack—cans of spray paint and tools—from the rest of his property and photographed the separate property. Mot. at 11:14–21; Opp. at 4:1–4. Recording only the evidence of a purported crime suggests that the officers "acted for purely investigatory reasons" in searching the backpack. *Anderson*, 101 F.4th at 598–99. Finally, because the search occurred while Ranney was restrained in a different room, "there was no immediate exigency related to securing the [backpack] and its contents"—this is "part of the totality informing whether the 'inventory' search conducted here was an excuse to rummage for evidence." *Id.* at 600 (cleaned up); *see* Mot. at 13:9–26; Opp. at 3:26–28.

Because Ranney proffers evidence showing that the search was not undertaken pursuant to

13

an administrative inspection scheme, the Government must show that the officers' subjective intent evinces a proper inventory search. *Anderson*, 101 F.4th at 594. This the Government fails to do. In fact, the Government proffers zero evidence of the officers' subjective intent. Indeed, Ranney proffers evidence showing that multiple officers claim to have no knowledge of any search or seizure associated with Ranney. Mot. at 6:4–7:1; Jaffe Decl., Ex. H. Therefore, the record evidence shows that the search of Ranney's backpack did not serve administrative goals.

Accordingly, the Court concludes that the Government fails to show that the warrantless search of Ranney's backpack falls within the inventory search exception.

**B.      Seizure**

Ranney argues that the seizure of his gloves was unconstitutional because the gloves "were not evidence of any crime that had been alleged," and there was no "probable cause to believe they were contraband." Mot. at 8:18–9:20. The Government contends that the seizure of Ranney's gloves was permissible because "[o]fficers had probable cause to arrest Ranney," and the gloves were "evidence of his identity and willfulness in damaging the sallyport garage door." Opp. at 4:6–14.

"[S]eizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal*, 506 U.S. at 68. As such, the "seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." *Payton*, 445 U.S. at 586. Under this standard, seizures of effects that are not authorized by a warrant are reasonable only where "there is probable cause to associate the property with criminal activity," such that "the item's incriminating character is 'immediately apparent.'" *Soldal*, 506 U.S. at 69 (citation omitted). The probable cause standard is satisfied where the seized item is contraband or there exists "cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 306–07 (1967).

Here, the Government asserts that because Ranney's arrest was supported by probable cause, officers were permitted to arrest Ranney without a warrant. Opp. at 4:15–5:23. Ranney does not argue that officers lacked probable cause to arrest him; nor does he challenge the validity

United States District Court
Northern District of California

14

United States District Court
Northern District of California

of his warrantless arrest in his Motion. *See generally* Mot; *see also* Reply at 9:17–10:19. For the purposes of this Motion, the Court thus presumes that Ranney's arrest was supported by probable cause. It is undisputed that at the time of his arrest, Ranney's gloves were on his hands, in plain view of the arresting officers. Mot. at 2:9–16; Opp. at 3:23–25. As such, the question is whether the Government had probable cause to seize Ranney's gloves at the time of his arrest. *Payton*, 445 U.S. at 586; *see* Reply at 9:20–22 ("[T]he constitutional question here is whether the seizure of the gloves, not the search of [Ranney], complies with the Fourth Amendment's dictates.").

The Court finds that the Government meets its burden in showing that the warrantless seizure of Ranney's gloves was justified by probable cause. The Government argues that probable cause existed because "officers could reasonably believe" that the gloves, "which Ranney was wearing when he committed the offenses in question, would aid in his later identification," and "officers could also reasonably have believed that the gloves demonstrated Ranney's state of mind in committing the offenses for which he was being arrested." Opp. at 6:26–7:5. Video evidence shows that "[o]f all the people striking and kicking the sallyport garage door," only one person was wearing gloves. *Id.* at 7:1–3; *see* Cohen Decl., Ex. A at 01:44–03:19. Therefore, at a minimum, the Government had probable cause to seize Ranney's gloves in order to identify Ranney as the person in the video allegedly damaging the garage door. *Cf. Hayden*, 387 U.S. at 297–98, 307 (finding warrantless seizure of "clothes found in the washing machine [that] matched the description of those worn by the robber," was reasonable).

Accordingly, the Court concludes that the seizure of Ranney's gloves was constitutional.

## C.    Fruit Of The Poisonous Tree

Ranney argues that all evidence obtained as a result of the unconstitutional search and seizure, including items seized from his backpack and photographs of the items seized from his person and backpack, must be suppressed as fruit of the poisonous tree. Mot. at 8:13–17.

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible . . . unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (citing *Wong Sun v. United States,* 371 U.S. 471,

488 (1963)).

Here, the Government does not dispute that items seized from Ranney's backpack and photographs of the items seized from his backpack constitute fruits of any unlawful search. *See generally* Opp. Therefore, these items are subject to potential exclusion, as discussed below. However, because the Court finds that the seizure of the gloves was constitutional, the photographs of the gloves are not subject to exclusion as fruits of the poisonous tree.[4]

**D.      Exclusion**

The Government argues that even if the Court finds "the searches and seizures unreasonable, the evidence derived therefrom would not be subject to the exclusionary rule." Opp. at 4:6–14. Ranney responds that the exclusionary rule applies here. Reply at 12:6–13:7.

The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens to be free from unreasonable searches and seizures. *United States v. Calandra*, 414 U.S. 338, 347 (1974). The rule "excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well." *Alderman v. United States*, 394 U.S. 165, 171 (1969).

Here, the Court concludes that the exclusionary rule applies to exclude all evidence obtained as a result of the Government's unlawful search. The Government does not argue that an appropriate exception to the rule applies in this case. Instead, the Government relies on inapposite cases in arguing that the rule should not apply because officers acted in "objectively reasonable reliance on their understanding of their lawful authority and the necessity to discover whether any contraband or weapons were present." Opp. at 10:13–19. The main case cited to by the Government involved the "good faith" exception to the exclusionary rule. *See Herring v. United States*, 555 U.S. 135, 137–38, 142 (2009). Under this exception, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Id.* at 142. And the other case involved the "knock-and-announce" requirement for executing a warrant.

---

[4] The Court address the Government's loss of the gloves in its order on the parties motions *in limine*.

16

*See Hudson v. Michigan*, 547 U.S. 586, 588 (2006).  But here, there was no warrant.  Therefore, the good faith exception, and the knock-and-announce rule, are inapplicable.

Accordingly, the Court suppresses all evidence obtained as a result of the unlawful search of Ranney's backpack, including photographs of the items found in Ranney's backpack during the search.[5]

### V.   CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART and DENIES IN PART** Ranney's Motion to Suppress.

**IT IS SO ORDERED.**

Dated: July 9, 2026

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California

---

[5] In its Opposition, the Government addresses Ranney's motion *in limine* regarding testimony related to property seized from Ranney.  Opp. at 11:5–8.  Ranney responds to the Government's arguments in his Reply.  Reply at 13:8–18:15.  The Court does not address the parties' arguments here; instead, the Court addresses such testimony in its order on the parties' motions *in limine*.