CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

E. WISTAR WILSON (CABN 324705)
ELI J. COHEN (NYBN 5539226)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
Wistar.Wilson@usdoj.gov
Eli.Cohen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CALEB ALEXANDER RANNEY,<br><br>Defendant. | Case No. 3:25-CR-00416-TSH<br><br>**THE UNITED STATES' APPEAL OF THE MAGISTRATE JUDGE'S ORDER (DKTS. 111 & 161)** |

# TABLE OF CONTENTS


INTRODUCTION .....1

BACKGROUND .....2

A. Offense conduct .....2

B. Charging and pretrial litigation .....3

C. *Brady* litigation .....4

1. The government learned of and disclosed Glumaz's decertification pre-trial .....4

2. Ranney's motion to dismiss and the government's discovery efforts .....4

3. The magistrate judge's September 9 order .....6

ARGUMENT .....8

A. Standard of review .....8

B. The magistrate judge erred in finding that the government committed *Brady* violations .....8

1. Applicable law .....9

2. The magistrate judge erred in finding evidence favorable to Ranney .....11

(i) Disclosures pertaining to defense witnesses Glumaz and Hall .....12

(a) Glumaz disclosures .....13

(b) Hall disclosures .....16

(ii) Disclosures pertaining to government witnesses Rivero and Orchard .....17

(a) Rivero disclosures .....17

(b) Orchard disclosure .....18

(iii) Disclosure pertaining to ICE Officer text messages .....19

3. The magistrate judge erred in analyzing materiality .....19

C. The magistrate judge's jury instruction is an abuse of discretion because there was no *Brady* violation, but even if there had been, a continuance remains the appropriate remedy .....23

CONCLUSION .....25

## CASES

*Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) ........ 9

*Bailey v. Rae*, 339 F.3d 1107 (9th Cir. 2003) ........ 20

*Brady v. Maryland*, 373 U.S. 83 (1963) ........ 1

*Giglio v. United States*, 405 U.S. 150 (1972) ........ 9

*Kyles v. Whitely*, 514 U.S. 419 (1995) ........ 10

*Malone v. Felker*, 453 F. App'x 754 (9th Cir. 2011) (unpublished) ........ 9

*Martinez v. Ryan*, 926 F.3d 1215 (9th Cir. 2019) ........ 14

*Milke v. Ryan*, 711 F.3d 998 (9th Cir. 2013) ........ 9

*Napue v. Illinois*, 360 U.S. 264 (1959) ........ 9

*Silva v. Brown*, 416 F.3d 980 (9th Cir. 2005) ........ 11

*Strickler v. Greene*, 527 U.S. 263 (1999) ........ 10

*United States v. Bagley*, 473 U.S. 667 (1985) ........ 10

*United States v. Brown*, 728 F. App'x 614 (9th Cir. 2018) (unpublished) ........ 12

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ........ 8, 11

*United States v. Cloud*, 102 F.4th 968 (9th Cir. 2024) ........ passim

*United States v. Dominguez*, 641 F. App'x 738 (9th Cir. 2016) (unpublished) ........ 24

*United States v. Felix*, No. CR 13-633 PJH, 2014 WL 5872824, at *4 (N.D. Cal. Nov. 12, 2014), *aff'd*, 663 F. App'x 557 (9th Cir. 2016) (unpublished) ........ 9

*United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ........ 11

*United States v. Garcia*, No. 18-cr-00466-BLF, 2022 WL 1801496 (N.D. Cal. June 2, 2022), *aff'd*, No. 22-10291, 2025 WL 314126 (9th Cir. Jan. 28, 2025) ........ 24

*United States v. Garcia-Gonzalez*, 790 F.3d 1175 (9th Cir. 2015) ........ 8

*United States v. Garrison*, 888 F.3d 1057 (9th Cir. 2018) ........ 2, 8, 23, 24

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) (en banc) ........ 8

*United States v. Ibarra*, 502 U.S. 1 (1991) ........ 1

*United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007) ........ 10

*United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) ........ 11, 15

*United States v. Luis-Amazar*, 2026 WL 1613935 (D. Ariz. June 4, 2026) .......... 14

*United States v. Mayers*, No. CR16-0258-JCC, 2017 WL 823292 (W.D. Wash. Mar. 2, 2017) .......... 11

*United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013) .......... 22

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009) .......... 20

*United States v. Roberson*, 859 F.2d 1376 (9th Cir. 1988) .......... 25

*United States v. Scott*, No. CR 19-29-GF-BMM, 2020 WL 4784693 (D. Mont. August 18, 2020) .......... 12

*United States v. Sedaghaty*, 728 F.3d 885 (9th Cir. 2013) .......... 9

*United States v. Souffront*, 338 F.3d 809 (7th Cir. 2003) .......... 10

**RULES**

Fed. R. Evid. 403 .......... 18

Fed. R. Evid. 404(b)(1) .......... 15

Fed. R. Evid. 608 .......... 18

Fed. R. Evid. 609 .......... 18

## INTRODUCTION

Pursuant to Federal Rule of Criminal Procedure 58(g)(2)(A) and Criminal Local Rule 58-2, the government hereby appeals orders issued by Magistrate Judge Thomas S. Hixson that erroneously concluded that the government committed violations under *Brady v. Maryland*, 373 U.S. 83 (1963), and ordered an unwarranted adverse jury instruction as a remedy. *See* Dkts. 111, 161. This Court has jurisdiction under the collateral-order doctrine, pursuant to 28 U.S.C. § 1291. *United States v. Cloud*, 102 F.4th 968, 973-74 (9th Cir. 2024) (internal quotation omitted).

Defendant Caleb Alexander Ranney is charged with Assault on a Federal Officer (18 U.S.C. § 111(a)(1)), and Destruction of Government Property (18 U.S.C. § 1361), based on his conduct on August 8, 2025. Dkt. 1. A jury trial was originally set to begin on July 27, 2026. Dkt. 21. Five days before trial, Ranney moved to dismiss, and in the alternative moved for a remedial jury instruction, alleging the government had violated its discovery obligations under *Brady*. Dkt. 94. On July 26, 2026, the magistrate judge denied the requested remedies but found an "uncured, ongoing *Brady* violation" and subsequently continued the trial until October 5, 2026 to allow the government to provide Ranney with additional discovery. Dkt. 111 at 6 n.1; Dkt. 116.

Ranney immediately moved the magistrate judge for reconsideration of his decision not to dismiss the case or impose an adverse jury instruction. Dkt. 112. Within the 14 days allowed for appeal to this Court, the government also moved for reconsideration, but of the magistrate judge's *Brady* violation finding, arguing that the magistrate judge had failed to properly apply the relevant legal standard for *Brady* materiality to the facts and arguments before him. Dkts. 129, 129-1; Civil L. R. 7-9(b)(3); *United States v. Ibarra*, 502 U.S. 1, 6 (1991). Meanwhile, however, the government obtained additional materials consistent with the magistrate judge's order, *see* dkt. 89, and made additional disclosures. Ranney cited these additional productions—the very purpose of the magistrate judge's continuance of the trial—as reasons why that continuance was an insufficient remedy for the government's alleged *Brady* violation. Dkt. 112 at 4, 7; Dkt. 132 at 4, 13; Dkt. 151.

On September 9, 2026, the magistrate judge denied the government's motion for leave to file its reconsideration motion. Dkt. 161 at 20. The magistrate judge also denied Ranney's request to dismiss the case, but based on the government's further productions, granted Ranney's request for an adverse jury

instruction at trial, to wit: that the government had violated Ranney's constitutional rights and that this alone could support finding reasonable doubt as to Ranney's guilt. *Id.* at 11, 18.

This Court should reverse. The government has not committed *Brady* violations. But even if it had, the magistrate judge's remedy of continuing the jury trial cured any possible prejudice. Ranney can make full use of the discovery at trial, including through rigorous examination of witnesses. While a curative instruction was given in *United States v. Garrison*, 888 F.3d 1057, 1061 (9th Cir. 2018), the circumstances that justified that instruction—namely that the *Brady* material was produced mid-trial leading to the case to be dismissed against Garrison's co-defendants—are absent here. The instruction the magistrate judge intends to give is tantamount to a directed verdict and is an abuse of discretion.

## BACKGROUND

### A. Offense conduct

This case stems from an August 8, 2025 protest at the United States Appraisers Building at 630 Sansome Street, San Francisco. The offense conduct is captured on surveillance videos. *See generally* Declaration of Eli J. Cohen (hereafter "Cohen Decl."), Exhibit A ("Ex. A") at 2:45-3:59; Exhibit B ("Ex. B") at 00:54-2:10. Video shows that Ranney and other protesters initially gathered outside a sallyport door on Jackson Street as it opened to allow immigration detainee vans to exit and drive down the street. Ex. A at 00:00-00:05. Immigration and Customs Enforcement (ICE) officers and members of the Federal Protective Service (FPS) escorted the vans through the protesters and down the road. *Id.* at 00:05-00:54. After the vans successfully made it down Jackson Street, ICE and FPS personnel retreated into the sallyport. Ex. A at 01:44-02:23, Ex. B at 00:00-00:31. Once the sallyport door closed, Ranney and others began kicking and shoving it, causing it to come off its track and creating a large gap on one side. Ex. A at 02:45-03:18.

Law enforcement personnel, including FPS District Commander Scott Hall and FPS Inspector Stephen Glumaz, were standing behind the closed sallyport door as Ranney kicked it. Hall told Glumaz to discharge a crowd control device called an FN 303 launcher. Dkt. 161 at 12. The FN 303 is similar to a pepperball device. From behind the garage door and through the gap created by the protesters, Glumaz deployed projectiles at the ground, the impact of which can be seen on video in puffs appearing on the ground, and the demonstrators dispersed. Ex. A at 03:18-03:28.

The video footage shows that at approximately 3:22:23 p.m., someone behind the closed sallyport door deployed the FN 303 for the final time through the gap the protesters created. Ex. B at 1:32 (timestamp of approx. 3:22:23 in top left). Ranney lingered on the sidewalk, then ran to the other side of Jackson Street as the protesters generally cleared out from the area in front of the sallyport door. *Id.* at 1:32 – 1:41. About 20 seconds later, five ICE officers, including Officer Joe Love, walked down an empty sidewalk on Jackson Street toward the sallyport door and entrance area. Ex. B at 1:54-2:06. The area in front of the sallyport door was entirely clear of people at this point; the protesters had dispersed. *Id.* Two cars slowly inched down the street. *Id.* When Love first appeared at approximately 3:22:53 p.m.—about 30 seconds after the last use of the FN 303—the street was essentially empty apart from federal personnel. *Id.* at 2:02. As Love walked down the sidewalk toward the sallyport entrance and a thermos-type bottle on the ground, there were no protesters near him and he had nothing in his hands (he was not holding, let alone brandishing, an FN 303 or any weapon). *Id.* at 2:02 – 2:06. At 3:22:58 p.m.—approximately 35 seconds after the last FN 303 projectile—Ranney ran toward Love from diagonally behind him and across the road. *Id.* at 2:06. Love pivoted slightly to face Ranney, then stood still. *Id.* at 2:06 – 2:08. He did not grab a weapon or raise his hands; rather, he crossed his arms over his chest in a braced position as Ranney shoved him with both hands. *Id.* at 2:06 – 2:10. Ranney was then arrested.

**B. Charging and pretrial litigation**

Ranney was charged by Information on December 5, 2025. Dkt. 1. Jury trial was set for July 27, 2026, and pretrial filing deadlines were imposed. Dkt. 21. The parties filed exhibit lists, witness lists, and motions *in limine* on June 24, 2026. Dkts. 27-29, 35-38. Of the officers who had been present on August 8, 2025, the government listed Love, other ICE officers, FPS Inspectors Tirrany James and Joseph Orchard as potential witnesses, and others not relevant to the instant appeal. Dkt. 36. The government also listed its case agent, FPS Senior Special Agent Timothy Rivero, who was not present at the scene on August 8. Dkt. 36. The government did *not* list Glumaz or Hall. *Id.* The defense's witness list included only its investigator, Catherine Goulet. Dkt. 28. On June 24, 2026, the government moved *in limine* to preclude the defenses of necessity, justification, self-defense or defense-of-others. Dkt. 37 at 8. The government argued that the evidence showed neither Ranney nor anyone else was under an immediate threat of unlawful (i.e. excessive) force that could justify the assault of Love as self-defense or defense-

of-others, and that the defense had proffered no evidence to the contrary. *Id.* at 15-16. In response, on July 1, 2026, the defense asked the magistrate judge to defer ruling on self-defense, arguing that it expected there to be evidence supporting such instructions. Dkt. 41 at 11-15.

**C. *Brady* litigation**

**1. The government learned of and disclosed Glumaz's decertification pre-trial**

In preparing for trial, the government made standard *Henthorn* requests for the various witnesses at issue in this case and was largely informed of a lack of responsive materials. *See generally* Dkt. 105. The government conducted various interviews, including a May 20, 2026 meeting with Glumaz. He discussed his use of the FN 303 on August 8, 2025, and stated that he had been decertified from using the device afterward. Dkt 104-1. On July 1, 2026, Agent Rivero sent a report documenting that interview to government counsel, who produced it to the defense the same day (three and a half weeks before trial). Dkt. 105 at ¶ 13. The report stated in relevant part "Wit[ness] advised that he was subsequently decertified as an FN-303 user. Which he later intends to recertify at a later date." Dkt. 95-5. The government had previously produced, on June 10, 2026 (six and a half weeks before trial), an email chain from Glumaz's supervisor suggesting his August 8 use of the FN 303 was potentially outside FPS policy. Dkt. 105-8.

The government learned on July 14, 2026 that the defense had subpoenaed Glumaz on July 9, 2026 to testify at trial. Dkt. 95 at ¶ 5; Dkt. 105 at ¶ 15. On July 21, 2026, government counsel, along with Agent Rivero, met with Glumaz again. Dkt. 105 at ¶ 16. During that meeting, Glumaz stated that his FN 303 decertification was in fact due to two incidents—the one underlying this case, and a subsequent one on a date he could not recall—and that he had been informed by email. *Id.* The next day, Agent Rivero obtained and provided to government counsel a copy of that email, as well as a written summary of the July 21 meeting. *Id.* at ¶ 17. The government produced those documents to Ranney on the day of receipt. *Id.* The email Glumaz received noted that the decertification was "in connection with" the use of force incident on August 8, 2025, and another on August 20, 2025. Dkt. 105-11 (under seal).

**2. Ranney's motion to dismiss and the government's discovery efforts**

Although Ranney had prior notice that Glumaz's deployment of the FN 303 was potentially outside FPS policy and that Glumaz had subsequently been decertified, on July 23, 2026, the Thursday before his trial was set to begin the following Monday, Ranney moved to dismiss the case, alleging a *Brady* violation

based on the disclosure of the *connection* between Glumaz's FN 303 decertification and the August 8, 2025, incident. Dkt. 94. The defense also made a series of new discovery requests. Dkt. 89; Dkt. 94 at 20-22. The government immediately reached out to the relevant agencies to obtain the materials and made additional disclosures to the defense in an effort to allow the trial to go forward as scheduled. *See* Dkt. 105 at ¶ 19-29; Dkt. 112 at 4-5. The government opposed the motion to dismiss on July 25. Dkt. 104.

On Sunday July 26, 2026, the magistrate judge issued a written order finding that the late-disclosed information was favorable under *Brady*, that "important evidence that is likely favorable to the accused has still not been produced," and that because "the missing evidence is likely favorable to the accused . . . [Ranney's] not having it is prejudicial to him." Dkt. 111 at 5. The magistrate judge concluded that there was an "ongoing, uncured *Brady* violation." *See id.* at 5-6 n.1. The magistrate judge declined to dismiss the case and denied the defense's request for an adverse jury instruction or the production of "overbroad and not proportional" discovery requests, finding that the lesser remedy of a modest continuance would cure any prejudice. *Id*. Later that day, the defense filed a motion for reconsideration. Dkt. 112. The trial was continued to October 5, 2026.

The government diligently continued pursuing the defense's requests and obtaining, evaluating, and producing responsive materials, including various unsubstantiated complaints and other internal agency documents. *See* Dkt. 132 at 5-6; Dkt. 145 at 11-12; Dkt. 151 at 5-7. Despite the government's disagreement with the magistrate judge's expansive view of *Brady*, in an effort to comply with the spirit of the magistrate judge's July 26, 2026 order, the government produced expansively. *See, e.g.*, Dkt. 142-4. The government also filed its own motion for reconsideration. *See* Dkts. 129, 129-1.

The full scope of materials the government produced does not bear granular recitation here. As relevant to this appeal, however, it included the following items, the production of which the magistrate judge later found demonstrated further *Brady* violations: (i) a "Training History Report" appearing to demonstrate that Glumaz's FN 303 certification had lapsed before August 8, 2025 (Dkt. 113-5) (under seal); (ii) a DHS OIG Report of Investigation (ROI) detailing an off-duty shooting incident from 2007 in which Glumaz was involved, was found to be carrying a gun off-duty without the proper license, and noting that he resigned while the investigation was pending, along with a disclosure that Glumaz had told government counsel that he had never resigned from a law enforcement job while under investigation

(Dkt. 113-4) (under seal); (iii) a complaint to DHS OIG about Glumaz's use of the FN 303 on August 8 (Dkts. 133-2, 133-3) (under seal); (iv) an identical DHS OIG complaint describing Glumaz's conduct on August 8, but naming Orchard as the subject (even though it is undisputed that Orchard neither carried nor deployed an FN 303 on August 8, 2025) (Dkt. 133-6) (under seal); (v) two unresolved DHS OIG complaints against Hall alleging that in 2018 he had ordered a subordinate to remove purportedly exculpatory material from a report and that in 2025 he failed to follow FPS evidence management procedures (Dkt. 133-5) (under seal); (vi) emails indicating that certain ICE officers had lost access to text messages from August 8 and a separate August 20, 2025 incident (Dkt. 133-4); and (vii) a disclosure that Agent Rivero [redacted] (Dkt. 151-2) (under seal).

With respect to the "Training History Report" (item (i)), the government subsequently obtained and produced a different training history report that showed Glumaz did have a valid certification on August 8, 2025, and filed a sworn declaration from the Director of FPS's Training Management and Professional Development division explaining the discrepancy between the two sets of records and affirming that Glumaz was certified to operate the FN 303 at the time of the August 8 incident. Dkt. 132 at 5; Dkt. 142-6. The government also disclosed an FPS Use of Force review memorandum finalized on August 18, 2026, which found that Glumaz's FN 303 use on August 8 was outside of policy, producing it to the defense the same day it was finalized. Dkt. 145-2 (under seal); Dkt. 145 at 4-6.

**3. The magistrate judge's September 9 order**

On September 9, 2026, the magistrate judge granted in part and denied in part Ranney's motion for reconsideration, finding that the government had committed additional *Brady* violations based on these further disclosures, and that while dismissal was not warranted, an adverse jury instruction was. Dkt. 161 at 17. Specifically, the magistrate judge found that the items pertaining to Glumaz and Hall (items (i)-(iii) and (v), above) were "exculpatory as they bear on whether Glumaz used unlawful force and whether Hall's command to Glumaz to use force was improper." *Id.* at 13. The magistrate judge also found that items pertaining to Orchard and Rivero (items (iv) and (vii)) were favorable in that "the Orchard EDS Report and Government's disclosure regarding Rivero—showing that a complaint was made against Orchard for the August 8 incident and that Rivero [redacted]

[redacted]—could potentially be used to impugn the credibility of those two witnesses and thus should have been disclosed much sooner." *Id.* at 15. Finally, the magistrate judge found that "the fact that ICE admits that text messages relating to the August 8 and August 20 protests "did not transfer over" when agents' phone were upgraded is favorable to Ranney." *Id.* Of note, the magistrate judge "refer[red] to evidence under *Brady* and *Giglio* collectively as *Brady* evidence." *Id.* at 11 n.6.

Although the items were disclosed in advance of the new trial date, the magistrate judge found that they were suppressed because they had not been disclosed as of the time of the original trial date. Dkt. 161 at 12. Collectively, the late-disclosed items were found to be material because "the suppressed evidence is favorable to Ranney; thus, his not having it is prejudicial to him," and because "[t]he evidence as a whole could strengthen Ranney's self-defense defense and weaken the Government's case by revealing multiple credibility issues." *Id.* at 16. Although neither Glumaz nor Hall was on the government's witness list, the magistrate judge found that even if the subsequent disclosures about them were properly characterized as *Giglio* evidence, the disclosures constituted *Brady* evidence because "Glumaz and Hall are fact witnesses who were part of the coordinated team of federal officers that acted during the protest on August 8 *and* are two officers who used force against protesters," and "[s]imply put, evidence undermining the credibility of key fact witnesses *is* exculpatory evidence." *Id.* at 13 (emphasis in original). Indeed, the magistrate judge further found that "the credibility of *any* officer on the team of officers who interacted with the protestors on August 8 could affect the jury's perception of whether the team's use of force was unlawful and thus whether self-defense was justified under the circumstances[,]" and that "a jury could also interpret Glumaz's dishonesty as tainting the team." Dkt. 161 at 13-14 (emphasis added). The magistrate judge found that the government's inclusion of Orchard's incident report from August 8 (which Hall approved and signed) on its exhibit list meant it was required to turn over impeachment evidence for Hall as a "non-testifying hearsay declarant." *Id.* at 14.

The magistrate judge found that "[u]nlike when the Court issued its MTD Order, it appears that the scope of the missing *Brady* evidence is now known and will be available to Ranney at trial." Dkt. 161 at 17-18. Nonetheless, the magistrate judge accepted Ranney's claim that he had been "prejudiced by the Government's repeated *Brady* violations as he has 'lost the element of surprise' and 'has spent countless hours litigating these matters.'" *Id.* at 17 (quoting Dkt. 132 at 13). Accordingly, the magistrate judge

indicated that, at trial, he would instruct the jury as follows:

> Under the United States Constitution, in order for the defendant to receive a fair trial, the Government must inform the Defense of any information known to the Government that tends to suggest the defendant might not have committed the crimes or crime charged and any information that casts doubt on the credibility of the Government's own evidence. In this case, the Government violated those important Constitutional principles upon which the fair administration of our system of justice depends on multiple occasions. In evaluating the merits of this case, you can decide what weight, if any, to give to the Government's violations of these Constitutional principles. The Government's actions standing alone or in combination with other facts presented in this case, may create a reasonable doubt in your mind about the defendant's guilt.

*Id.* at 18 (citing *Garrison*, 888 F.3d at 1063 n.3, and Ninth Cir. Model Crim. Jury Instr. 3.20 (Untimely Disclosure of Exculpatory or Impeachment Evidence)).

## ARGUMENT

### A. Standard of review

*Brady* claims are reviewed de novo. *United States v. Garcia-Gonzalez*, 790 F.3d 1175, 1180 (9th Cir. 2015). The remedy for a *Brady* violation is reviewed for abuse of discretion. *United States v. Bundy*, 968 F.3d 1019, 1043 (9th Cir. 2020). In applying the abuse-of-discretion standard, the Court first determines de novo "whether the trial court identified and applied the correct legal rule to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). It then determines whether the trial court's factual findings and application of the correct legal standard to those facts were "illogical, implausible, or without support in inferences that may be drawn from the record." *Id.* at 1251, 1263; *see also id.* at 1264–65 (analyzing at the second step whether the district court made any "clearly erroneous factual finding").

### B. The magistrate judge erred in finding that the government committed *Brady* violations

Although discovery record here is somewhat convoluted, a careful and fair examination shows that the government did not commit a *Brady* violation. Across its July 26 and September 9 orders, the magistrate judge found *Brady* violations based on disclosures pertaining to two defense witnesses (Glumaz and Hall), two government witnesses (case agent Rivero, and Orchard), and select ICE officers who may not have retained text messages from the August 8 incident. Dkt. 111 at 4-5; Dkt. 161 at 12-16. The

disclosures at issue are not favorable under *Brady*, for the reasons discussed below. But even if they were, they are not material; much of the evidence at issue is inadmissible or inconsequential, and does not change the defense's strategy when viewed in the context of the pretrial record. Of note, on September 22, 2026, the magistrate judge denied the government's motion *in limine* to preclude questioning regarding, and/or the admissibility of, many of the items discussed below. *See* Dkt. 175 at 8-11; Dkt. 179. The government maintains that these items should largely not be admitted or used at trial.

**1. Applicable law**

To establish a *Brady* violation, a defendant must show that (1) "the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching"; (2) "the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent"; and (3) "the evidence is material to the guilt or innocence of the defendant." *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013).

Evidence is favorable "either because it is exculpatory or impeaching," and includes evidence "that would tend to call the government's case into doubt." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). Exculpatory evidence is "evidence that tends to prove the innocence of the defendant." *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014). Evidence that "impeaches a *prosecution* witness" is also favorable. *Id.* at 1135 (emphasis added). Indeed, "'[w]hen the reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*'s] general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

Generally, evidence that impeaches a defense witness is not considered favorable. Indeed, "[n]o Supreme Court precedent clearly establishes that possible impeachment evidence of a *defense* witness is favorable to the accused, thereby mandating disclosure under *Brady*." *Malone v. Felker*, 453 F. App'x 754, 754 (9th Cir. 2011) (unpublished) (emphasis added). Consistent with this observation, "[a]lthough the Ninth Circuit has not ruled on the issue whether *Giglio* obligations extend to witnesses whom the government does not call at trial, several circuit courts have held that the *Giglio* obligation to disclose impeachment materials does not extend to defense witnesses, apart from the *Brady* obligation to disclose exculpatory evidence." *United States v. Felix*, No. CR 13-633 PJH, 2014 WL 5872824, at *4 (N.D. Cal.

Nov. 12, 2014), *aff'd*, 663 F. App'x 557 (9th Cir. 2016) (unpublished) (collecting cases). Several courts have recognized the absence of a *Brady* obligation to disclose impeachment material for a defense witness even where the witness was a law enforcement officer involved in the case. *See United States v. Alejo*, No. 17CR1369-H, 2017 WL 6327114, at *5 (S.D. Cal. Dec. 11, 2017), *aff'd sub nom. United States v. Camargo-Alejo*, 747 F. App'x 551 (9th Cir. 2018) (unpublished) (holding that the government did not violate its obligations under *Brady*, *Giglio*, or Rule 16 in not producing impeachment material for a Border Patrol agent involved in the case and called by the defense, noting, "[b]ecause the disclosed documents contained impeachment information for a defense witness and not exculpatory information, the United States was not obligated under *Brady*, *Giglio*, or Rule 16 to produce the documents."); *United States v. Souffront*, 338 F.3d 809, 824 (7th Cir. 2003) (no *Brady* violation for failure to disclose impeachment material for ATF agent who was an investigator in the case and was called only by the defense, noting that "[i]mpeaching the testimony of their own witness is not favorable to the defense" under *Brady*).

Evidence is "suppressed" if it is known to the government but not disclosed to the defendant. *Cloud*, 102 F.4th at 976. The prosecution is deemed to have knowledge of and access to anything in the possession of any federal agency participating in the same investigation of the defendant. *Id.*

In the typical post-trial context, evidence is "material" if "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "In considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, judges must undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *United States v. Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007) (quotation marks omitted). "In other words, the withheld evidence must be analyzed in the context of the entire record." *Id.* (quotation marks omitted). In assessing materiality, the suppressed evidence should be evaluated collectively, rather than item-by-item. *Kyles v. Whitely*, 514 U.S. 419, 436 (1995).

In the Ninth Circuit, when suppression of favorable evidence is discovered in the pre- or mid-trial context, "before a 'look back' is possible," materiality is "benchmarked against the relative value of the evidence in light of the proceedings to date—not as a retrospective evaluation of how the disclosure may

have impacted the outcome of a trial that has not yet concluded." *Cloud*, 102 F.4th at 980. This pretrial materiality inquiry "should evaluate the relative value of the withheld evidence 'on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point," and consider "whether, had the evidence been timely disclosed, it might have altered the prosecution or defense strategy." *Id.* (quoting, in part, *United States v. Bundy*, 968 F.3d. 1019, 1033 (9th Cir. 2000)).

Finally, "[t]o be material under *Brady/Giglio*, 'undisclosed information or evidence acquired through that information must be admissible,' or capable of being used 'to impeach a government witness.'" *United States v. Kohring*, 637 F.3d 895, 903 (9th Cir. 2011) (internal citations omitted). Evidence regarding the reliability of a government witness "is especially likely to be material where it impugns the testimony of a witness who is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). In contrast, evidence of specific instances of past misconduct of law enforcement officers, in disciplinary records or elsewhere, typically is not admissible unless it concerns or bears on the officer's veracity. *See, e.g.*, *United States v. Mayers*, No. CR16-0258-JCC, 2017 WL 823292 at *2 (W.D. Wash. Mar. 2, 2017) (finding no *Brady* violation based on post-trial disclosure of disciplinary records of law enforcement officers that did not bear on credibility, noting for non-testifying officers that "even if these officers had testified, the evidence would not be admissible because Federal Rules of Evidence 608(b) prohibit testimony on specific instances of past conduct like these that do not bear on the truthfulness or untruthfulness of the witness."). Moreover, a violation "may be cured . . . by belated disclosure of evidence, so long as the disclosure occurs at a time when disclosure would be of value to the accused." *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (quotation marks omitted).

**2. The magistrate judge erred in finding evidence favorable to Ranney**

The majority of the disclosures at issue pertain to defense witnesses Glumaz and Hall, for whom impeachment evidence is not favorable under *Brady*. Information regarding Glumaz's decertification on the FN 303 is not exculpatory because self-defense should not be available as a matter of law. Given the attenuation in space and time between Glumaz's deployment of the FN 303 and Ranney's assault of a different officer, who was not near any protesters and presented no threat of force, Glumaz's use of force does not support a theory of self-defense. Additional disclosures pertaining to Rivero and Orchard, even if favorable, are not material. Finally, there is no basis to conclude that any inadvertently lost text

messages between officers were even relevant, let alone favorable.

**(i) Disclosures pertaining to defense witnesses Glumaz and Hall**

The magistrate judge erred in concluding that the below-referenced disclosures for Glumaz and Hall, both defense witnesses, constituted favorable evidence under *Brady*. The magistrate judge concluded that "Glumaz and Hall are fact witnesses who were part of the coordinated team of federal officers that acted during the protect on August 8 *and* are two officers who used force against protesters," such that "evidence undermining the[ir] credibility" is exculpatory. Dkt. 161 at 13 (emphasis in original). The magistrate judge went further, noting that "the credibility of any officer on the team of officers who interacted with protesters on August 8 could affect the jury's perception of whether the team's use of force was unlawful and thus whether self-defense was justified under the circumstances." *Id.* In addition, as noted above, the magistrate judge wrote that "a jury could interpret Glumaz's dishonesty as tainting the team." *Id.* at 14.

As a threshold matter, the government is aware of no legal authority to support the proposition that impeachment or other information as to one officer can be imputed to and used to impeach other officers who are assigned to work with them. It is unclear from a practical standpoint how the government would even begin to go about identifying all such potential impeachment material for a given officer based on associations with other officers.

The notion that impeachment material for any law enforcement witness present at the August 8 incident (whether or not they testify) is exculpatory finds no support in case law. *See United States v. Brown*, 728 F. App'x 614, 618 (9th Cir. 2018) (unpublished) (upholding district court denial of defendant's motion for discovery regarding non-testifying officer's personnel file, noting "such discovery is not required as to an officer who does not testify."); *United States v. Scott*, No. CR 19-29-GF-BMM, 2020 WL 4784693 at *2 (D. Mont. August 18, 2020) ("[The defendant] appears to be under the impression that *Brady* and *Henthorn* require the government to review *all* personnel files and submit to [the defendant] *any* information that would cast doubt on the credibility of *all investigating* law enforcement officers . . . . That is not the law.") (emphasis in original).

Neither Glumaz nor Hall is part of the government's case-in-chief. Their testimony is unnecessary to establish the elements of the charged offenses: they were not witnesses to the assault on Officer Love,

and the government could prove Ranney's destruction of government property with video evidence alone. The government's affirmative case does not rely on Glumaz's or Hall's account of events, and their credibility is irrelevant. Although Glumaz authored a portion of the FPS incident report about August 8, 2025 and Hall signed off on it, the government is not seeking to introduce that report into evidence at trial (and could not in any event, as it is replete with inadmissible hearsay). Glumaz and Hall may be relevant to Ranney's view of the case, but that does not render them "key fact witnesses" or transform them into the type of witnesses on whom the government's case depends. *See* Dkt. 161 at 13.

Although the disclosures regarding Glumaz and Hall are irrelevant to the government's case, each of the pertinent disclosures is nonetheless discussed in turn below.

**(a) Glumaz disclosures**

Glumaz's Decertification

The agency's accounting of Glumaz's decertification on the FN 303 has evolved over time. On July 22, 2026, the government disclosed a March 25, 2026 email communicating to Glumaz that he was being decertified as an operation of the FN 303 in connection with two incidents on August 8, 2025 and August 20, 2025, respectively. Dkt. 105-11 (under seal). Early records indicated that the basis for Glumaz's decertification on the FN 303 in connection with the August 8, 2025 incident was not based on any conclusion that Glumaz's use of force on that date was outside of policy. Indeed, per a different March 25, 2026 email, FPS's Use of Force Review Committee (hereafter, the "Committee") met on March 24, 2026, reviewed Glumaz's use of force on the August 8 and August 20, 2025 incidents, and determined that Glumaz's use of force on August 8 "was within policy and training doctrine," but that the narrative Glumaz had provided in his report was inadequate; in other words, decertification was appropriate, but Glumaz's use of force on August 8, 2025 was policy-compliant. Dkt. 105-17 (under seal). The finding that Glumaz's use of the FN 303 on August 8 was within policy was directly at odds with the notion that Glumaz's use of the FN 303 on that date was excessive and therefore was not favorable within the meaning of *Brady*, as it did not support an excessive force theory of self-defense. Other materials reflecting the referral of this use of force to OIG for investigation and subsequent declination by that agency have the same import and are immaterial. *See* Dkt. 161 at 4.

However, on August 18, 2026—*after* Ranney's original July 27, 2026, trial date—the Committee

issued a finalized memorandum for the August 8, 2025 incident that changes the prior conclusion, finding that Glumaz's use of the FN 303 on August 8 was *not* within policy and training doctrine. Dkt. 145-2 (under seal) (bearing a signature dated August 18, 2026, indicating it was only finalized on that date). The Committee's new conclusion does not necessarily mean Glumaz used excessive force as a matter of law, only that he failed to follow policy, but it is no longer inconsistent with a claim that Glumaz used excessive force on August 8. To the extent it supports a self-defense theory based on Glumaz's use of the FN 303 constituting excessive force, it is helpful to the defense under Rule 16, but not exculpatory because, as explained below, such theory is not legally viable given the circumstances of Ranney's assault of Officer Love. Ultimately, however, this memorandum, which government counsel produced to the defense on August 18, 2026—the same day it was issued—was not suppressed, and the magistrate judge did not suggest otherwise. Dkt. 142-2 at ¶ 5; Dkt. 161 at 12. Therefore, its production cannot support finding a *Brady* violation. *See Martinez v. Ryan*, 926 F.3d 1215, 1228 (9th Cir. 2019) (*Brady* concerns the evidence available at the time of trial, not "exculpatory evidence [that] later surfaces").

Glumaz's decertification on the FN 303 is not exculpatory—and therefore not favorable under *Brady*—foremost because self-defense should be unavailable as a matter of law. The video evidence in this case shows Ranney ran across an essentially empty street and shoved Love, who was walking away from him not holding or brandishing any weapons and, in response to Ranney's approach, stood still and folded his arms across his chest in a braced position. Based on that video evidence, no reasonable juror could find that Ranney could satisfy all of the multiple elements of self-defense, including the requirement that his use of force was necessary to defend against an *immediate* use of unlawful (i.e. *excessive*) force *from Love*, who, in that moment, presented no immediate threat of *any* use of force against any person, let alone excessive force. *See United States v. Luis-Amazar*, 2026 WL 1613935 at *3 (D. Ariz. June 4, 2026) (providing that self-defense against a charge of assaulting a person the defendant knows to be a federal officer "requires a defendant to have reasonably believed his use of force was necessary to defend against the officer's immediate use of unlawful—i.e., excessive—force; it does not extend to force that a defendant merely fears may occur at some point in the future.").

The magistrate judge has deferred ruling on the availability of a self-defense claim and a possible self-defense jury instruction, opting to see how the evidence comes in at trial, and thus leaving open the

possibility that Ranney can present a viable self-defense theory. Dkt. 74 at 10-11. Nevertheless, if there is a basis for asserting self-defense in this case, it cannot be Glumaz's deployment of the FN 303, which is simply too attenuated in space and time to bear on or support any viable theory of self-defense to assaulting Love. Indeed, even if Glumaz's deployment of the FN 303 from inside and behind the sallyport door constituted excessive force—a finding not made by the Committee or any other authority—it would not follow that Ranney could reasonably believe it necessary to run at Love from behind and shove him.

In sum, Glumaz's decertification on the FN 303 is not exculpatory even in light of the August 18, 2026 Committee memorandum finding that his use of force on August 8 was not within policy because a theory of self-defense premised on Glumaz's use of the FN 303 is not legally viable. But even if it were, the finalized August 18, 2026 memorandum and its finding did not exist before August 18, 2026, and was disclosed to Ranney immediately, so it was not suppressed. Ranney is in fact better positioned now to argue that Glumaz's use of the FN 303 on August 8 constituted excessive force; had he proceeded to trial on July 27, 2026, that finding would not have been available to him, as it did not exist.

<u>2007 OIG Report</u>

Other disclosures regarding Glumaz that the government made after the magistrate judge's original order do not constitute *Brady* material. The 2007 OIG report is neither favorable nor material within the meaning of *Brady*. The fact that Glumaz was investigated nearly twenty years ago for engaging in an off-duty shooting and for carrying a firearm without the requisite license does not make it more or less likely that he used excessive force in this case, particularly where he was not found to have used excessive force in the 2007 incident. The report does not support and is not relevant to Ranney's argument that he was acting in self-defense when he assaulted Officer Love. Even if the 2007 OIG report were favorable, it is inadmissible at trial for any propensity-based purpose and is therefore not material. *See* Fed. R. Evid. 404(b)(1) (providing that evidence of prior bad acts is not admissible to prove a person's character "in order to show that on a particular occasion the person acted in accordance with the character."); *Kohring*, 637 F.3d at 903 (9th Cir. 2011) (evidence must be admissible or capable of being used to impeach a government witness in order to be material).

The 2007 OIG report is also not favorable as impeachment for Glumaz. The report shows that Glumaz resigned while under investigation. This information, along with the government's disclosure

that he had represented the contrary, could be useful to impeach Glumaz's testimony, should he testify at trial. The magistrate judge, however, considered this evidence exculpatory, not merely impeachment evidence for Glumaz. Dkt. 161 at 13. The magistrate judge reasoned that "[a] jury could find that if Glumaz lied in the past, he may lie about his use of force on August 8 and whether it was appropriate; a jury could also interpret Glumaz's dishonesty as tainting the team." *Id.* at 13-14. As explained, any derogatory effect Glumaz's statement has on his credibility has no bearing on the government's case, as the government is not relying on his testimony to prove any fact of consequence in its case-in-chief. Impeachment evidence for a defense witness whose credibility does not bear on the government's case is not *Brady* material. As explained above, the finding that dishonesty by one officer can be imputed to or "taint" other officers is unsupported by law.

<u>Glumaz's training records (TAMS Report)</u>

Glumaz's training records, specifically records speaking to whether he was certified on the FN 303 at the time of the August 8 incident, are not favorable under *Brady*. The magistrate judge concluded that the TAMS Report "give[s] rise to an inference that Glumaz was not certified to operate the FN 303 on August 8," and is therefore "facially exculpatory." *See* Dkt. 161 at 14. But the record on which that conclusion relies was an incomplete one, and the inference drawn from it was incorrect; additional training records disclosed subsequently confirmed that Glumaz was certified on the date in question, and the government obtained an authoritative opinion from the Division Director of FPS's Training Management and Professional Development division confirming as much. *See* Dkt. 142-6 at ¶ 8. The magistrate judge's finding, therefore, relied on a factually incorrect understanding of the records. Moreover, even if the magistrate judge had understood the records correctly, they would not be exculpatory because a theory of self-defense based on Glumaz's use of the FN 303 is not legally viable.

**(b) Hall disclosures**

The government's disclosures of additional DHS-OIG reports regarding FPS District Commander Scott Hall are not evidence of *Brady* violations, as the information in them is not favorable let alone material. As an initial matter, the materials at issue pertain to an allegation with unknown outcome and a matter still under investigation. Indeed, with respect to the 2018 DHS-OIG allegation involving a claim that Hall improperly ordered a subordinate to delete exculpatory information from a report, it appears from

government counsel's further inquiries that, despite a referral of the complaint to FPS, FPS has no record of investigation, and therefore there are no findings; there appears to be neither a determination that it was substantiated, nor a determination that it was unsubstantiated. *See* 142-2 at ¶ 8. The July 2025 DHS-OIG complaint regarding "poor/improper management" practices is unresolved—the government has confirmed, as of the date of this filing, that it is still an active investigation. *See* Cohen Decl. at ¶ 4.

To the extent the 2018 DHS-OIG allegation is potential impeachment material for Hall, a defense witness, it is not subject to the government's disclosure obligations under *Brady*. Also, while the allegation is serious on its face, the veracity of the complaint, the propriety or impropriety of the alleged instruction, and the outcome of the inquiry are unknown. The complaint, particularly in light of its unresolved status and the fact that the government is not relying on Hall in any way, does not call the government's case into doubt and is therefore not exculpatory. Although Hall is listed as a supervisor and/or signed off on the FPS reports in this case, the government is not relying on those reports or seeking to have any statements from those reports admitted into evidence at trial in order to prove the charges. Nor could it; the statements are inadmissible hearsay. Contrary to the magistrate judge's conclusion, Hall is not transformed into a hearsay declarant by virtue of his having signed a report (containing other officers' statements) that is listed on the government's exhibit list. *See* Dkt. 161 at 14. As a result, evidence impeaching Hall does not amount to impeachment of a hearsay declarant for purposes of *Brady*.

Next, with respect to the July 2025 complaint regarding Hall alleging "poor/improper management practices" surrounding the disposition of evidence in a separate case, that agency investigation is ongoing. The complaint is not favorable under *Brady* because it does not exculpate the defendant of the assault or destruction of government property crimes, and it does not impeach the government's witnesses or its case more broadly. Moreover, it is not material; it is unclear how this complaint would support any viable defense theory and it should not be used or admitted at trial. *See* Dkt. 175.

**(ii) Disclosures pertaining to government witnesses Rivero and Orchard**

**(a) Rivero disclosures**

In its September 9, 2026 order, the magistrate judge found additional *Brady* violations based on two disclosures implicating the government's case agent, Rivero, who is listed on the government's witness list. *See* Dkt 161 at 14-15. The first of these disclosures was the same 2007 OIG Report discussed

above concerning Glumaz's off-duty shooting incident, which mentions that Rivero was interviewed about Glumaz's firearms qualifications records as part of the investigation. *See* Dkt. 161 at 3; Dkt. 113-3 (under seal). The magistrate judge appears to have adopted the defense's view that Rivero's connection to that investigation impugns his credibility on the grounds that he must have known about Glumaz's resignation during that investigation and withheld that information from the government. Dkt. 161 at 15 ("[T]hat Glumaz's resignation was known to Rivero could make Rivero look dishonest as a reasonable inference is that Rivero withheld this information from the Government."). The 2007 OIG Report does not create any negative credibility implication for Rivero, let alone constitute impeachment material for him. Indeed, it is not remotely clear that Rivero would have been obligated to disclose Glumaz's resignation to government counsel unprompted or that he would have had any reason to appreciate the significance of that information—that it was at odds with what Glumaz told government counsel outside of Rivero's presence—in Ranney's case.

The other disclosure pertaining to Rivero [redacted]. Dkt. 161 at 5; Dkt. 151-2 (under seal). The government disclosed Rivero's [redacted]—which contained no substantive information about the reason for the [redacted]—and information from its interviews of Rivero about it on August 24 and August 28, 2026, out of an abundance of caution. Dkt. 151-2 (under seal). The magistrate judge considered this information—that Rivero [redacted]—material that could "potentially be used to impugn [Rivero's] credibility." Dkt. 161 at 15. This conclusory assertion is wrong. Not every instance of "improper conduct" can be used to attack a witness' credibility. *See* Fed. R. Evid. 608, 609. [redacted] does not evince dishonesty and would be improper impeachment. *See also* Fed. R. Evid. 403. Thus, even to the extent that it is favorable, such information is not material; it does not call the government's case into doubt.

**(b) Orchard disclosure**

The magistrate judge also considered an OIG complaint regarding Inspector Orchard favorable, as Orchard is on the government's witness list. *See* Dkt. 161 at 14-15. The government had previously explained that this complaint was a red herring because although it lists Orchard as a subject of the

complaint, the description in the referral is identical to that pertaining to Glumaz from the same date and concerns the propriety of the use of the FN 303, whereas Orchard was not carrying an FN 303 on August 8, 2025. *See* Dkt. 142-1; Dkt. 133-3 (Glumaz complaint) (under seal); Dkt. 133-6 (Orchard complaint) (under seal). Further, the government confirmed that no further OIG or FPS materials exist related to Orchard regarding this incident. Dkt. 142-2 at ¶ 4. Nevertheless, the magistrate judge concluded, "There is no doubt that the Orchard EDS Report . . . could potentially be used to impugn" Orchard's "credibility." *See* Dkt. 161 at 15. A misdirected complaint related to a use of force that Orchard never undertook has no bearing whatsoever on his credibility. *See* Dkt. 161 at 15. It is neither impeachment material for a government witness nor is it exculpatory. It is not favorable, let alone material.

**(iii) Disclosure pertaining to ICE Officer text messages**

The magistrate judge concluded that a phone upgrade for ICE officers, which may have resulted in the loss of some ICE officer text messages from August 8 and August 20, 2025, was favorable information that the government should have disclosed to Ranney much sooner. Dkt. 161 at 15. It is not clear that *any* relevant (let alone favorable) text messages from August 8, 2025 (or August 20, 2025) were lost, particularly in light of the prosecution team's outreach on June 1, 2026 to ICE officers and other law enforcement personnel for all substantive written material pertaining to the case, including text messages. *See* Dkt. 142-2 at ¶ 10. Additionally, the fact that many ICE officers (including witnesses Love, Caldwell, and Kaskanlian, *see* dkt. 36) either upgraded their phones after that date or made backups beforehand suggests that the scope of potential spoliation—to the extent there was any—is not substantial. *See* Dkt. 142-7 at 2-3. The content of any potentially lost text messages is not known, such that the favorability of the messages is also speculative.

**3. The magistrate judge erred in analyzing materiality**

In both its July 26 and September 9, 2026, orders, the magistrate judge determined that Ranney had satisfied the materiality prong of *Brady*'s three-part test because the suppressed evidence at issue was favorable. *See* Dkt. 111 at 5 ("[T]he missing evidence is likely favorable to the accused, so his not having it is prejudicial to him."); Dkt. 161 at 16 ("As discussed, the suppressed evidence is favorable to Ranney; thus, his not having it is prejudicial to him."). In doing so, the magistrate judge misapplied the materiality standard applicable to pretrial *Brady* violations, collapsing the favorability and materiality prongs of the

standard for a *Brady* violation—favorability, suppression, and materiality—into one. Indeed, the magistrate judge appears to have reasoned that in the pretrial context, the suppression of favorable evidence itself establishes materiality, and thereby constitutes a *Brady* violation. It is not so.

In *Cloud*, the Ninth Circuit distinguished between the government's broad pretrial discovery *obligation* to disclose exculpatory materials under *Brady* (favorability) with the standard for finding a *Brady violation* (favorability, suppression, and *materiality*), discussing how to evaluate materiality in the context of a disclosure pre- or mid-trial. The court explained that "the proper test for *pretrial disclosures of exculpatory evidence* should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses," without regard to whether the information is material. *Cloud*, 102 F.4th at 979 (emphasis added). The Ninth Circuit reasoned that it is too difficult for a trial prosecutor to speculate as to the likely materiality of favorable evidence in determining whether it should be disclosed, and thus the "test" for what the government is obligated to disclose in its "pretrial disclosures of exculpatory evidence" is "evidence . . . favorable to the defense." *Id.*

In explaining this test for the government's broad pretrial disclosure obligations, however, *Cloud* did not suggest that it was also the test for materiality or for finding a pretrial *Brady* violation in the pretrial context. Indeed, a breach of a *Brady* disclosure obligation is not the equivalent of a *Brady* violation; although "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence . . . [,] strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was [prejudicial]." *United States v. Price*, 566 F.3d 900, 908 n.7 (9th Cir. 2009) (quoting *Bailey v. Rae*, 339 F.3d 1107, 1113 (9th Cir. 2003) ("[N]ot every violation of the duty to disclose constitutes a *Brady* violation . . . . A 'true' *Brady* violation . . . occurs only where . . . the evidence was material to the outcome such that the defendant was prejudiced by the suppression.").

Rather, in *Cloud*, the Ninth Circuit stated, "the materiality standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials," explaining that the typical materiality standard—whether there is a reasonable probability that the suppressed evidence would have produced a different result *at trial*—was "a poor fit in cases . . . where the suppression is discovered during trial and before a 'look back' is possible." 102 F.4th at 979 (internal quotation and citation omitted). The

Ninth Circuit explained that when evaluating a *Brady* claim in the pretrial (or mid-trial) context, "the materiality inquiry should evaluate the relative value of the withheld evidence 'on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point.'" *Id.* at 980. In other words, to satisfy the materiality prong when alleging a violation prior to trial, the defense must still show "a reasonable probability of a different result," but in the context of pretrial proceedings up to that point, rather than based on speculation as to the result of a trial that has not yet occurred. *Cloud* provided that, in that context, "the materiality analysis could consider whether, had the evidence been timely disclosed, it might have altered the prosecution or defense strategy." *Id.*

Against this backdrop, the magistrate judge's July 26 order finding a *Brady* violation misapplied the materiality standard applicable to pretrial disclosures. The magistrate judge found that the recently-disclosed evidence was favorable and that "important evidence that [was] likely favorable to the accused" had still not been produced, and had therefore been suppressed. *See* Dkt. 111 at 4-5. With respect to materiality, the magistrate judge concluded, "the missing evidence is likely favorable to the accused, so his not having it is prejudicial to him." *Id.* at 5. The conclusion that the suppression of likely favorable evidence was, *ipso facto*, prejudicial, was error; indeed, in reaching this conclusion, the magistrate judge appears to have collapsed the favorability and materiality standards into one. And in fact, the magistrate judge's own factual findings in its July 26, 2026 order logically support the conclusion that the evidence at issue was *not* material. As the order stated, the recently-disclosed and not-yet-disclosed information "*does not fundamentally change [Ranney's] planned defense*" because, as the pretrial filings make clear, "Ranney was always going to claim the federal officers used excessive force, were reckless and didn't know what they were doing, and that they were liars." Dkt. 111 at 6 (emphasis added). The magistrate judge found that, as a result, "the additional *Brady* evidence is important and must be produced, but it *will not change what this case is about in a significant way.*" *Id.* (emphasis added). Had the magistrate judge correctly applied the materiality standard, those findings would have effectively foreclosed Ranney's original *Brady* claim.

Ranney has all but acknowledged that the information was not material, stating during the July 27, 2026 hearing that, as of the night before, it had intended to request that trial proceed anyway starting July 28, 2026—notwithstanding the magistrate judge's order granting a continuance to allow the defense to

obtain the outstanding evidence. *See* Dkt. 129-3 at 4. Indeed, in subsequent briefing, the defense acknowledged that the withheld evidence "has not generally changed" Ranney's trial strategy but asserted that its trial strategy had nevertheless been altered because the defense would not have proceeded identically as it would have without the evidence. *See* Dkt. 145 at 15 ("Mr. Ranney could not have put on the same evidence and conducted the same cross-examinations absent" the evidence at issue.). But this assessment uses the wrong metric; evidence does not need to be a nullity to be immaterial under *Brady*. *See, e.g.*, *United States v. Olsen*, 704 F.3d 1172, 1184-85 (9th Cir. 2013) (finding suppressed material that could have been used both to cross-examine witness and further advance defense theory not material under *Brady*). The magistrate judge erred in finding materiality, and the government does not commit a *Brady* violation unless it suppresses favorable and *material* evidence.

The magistrate judge's September 9 order finding additional *Brady* violations based on later-disclosed evidence repeats the same error, stating, "As discussed, the suppressed evidence is favorable to Ranney; thus, his not having it is prejudicial to him." Dkt. 161 at 16. This conclusion, based on the additional disclosures discussed above, attributes vastly greater significance to these disclosures than they merit. Indeed, the magistrate judge's observation that "[t]he evidence as a whole could strengthen Ranney's self-defense defense and weaken the Government's case by revealing multiple credibility issues," such that "[e]ven the Government might have altered its strategy had it timely disclosed" the suppressed evidence, *id.*, depends as an initial matter on finding the information favorable, which the government disputes, but also on attributing a fair amount of import to each of them, which the government also disputes. As noted above, the government is not relying on Glumaz or Hall's account of events to support its case-in-chief. Even if Glumaz's use of the FN 303 constituted excessive force, it would not support a defense to Ranney's subsequent assault of Officer Love. Moreover, the evidence that the magistrate judge considers impugning of government witnesses Orchard and Rivero's credibility—a characterization the government also disputes—is not the type of evidence that calls the government's case into doubt, even if it is impeaching.

To reiterate: the case turns on video showing Ranney kicking government property until it breaks and running up from behind Officer Love and shoving him; Rivero (case agent) was not on scene, and Orchard was not present outside when the assault took place. Rivero's [redacted]

[redacted], an inference that Rivero should have told government counsel about a defense witness's resignation 19 years ago, and a (seemingly misdirected) use-of-force complaint against Orchard do not create a reasonable probability of a different result, even in the pretrial context. Nor do any credibility issues (or inadmissible past misconduct findings or allegations) regarding Glumaz or Hall—who were not even outside when Ranney assaulted Officer Love—or potential lost text messages from ICE officers. Moreover, now that the trial has been continued, Ranney can put the later-disclosed information to full use in preparation for and during trial, so any prejudice he might otherwise have suffered will be eliminated. Thus, the record does not support finding that the government's disclosures after its July 26 order were material, or that the government committed additional *Brady* violations based on those disclosures.

### C. The magistrate judge's jury instruction is an abuse of discretion because there was no *Brady* violation, but even if there had been, a continuance remains the appropriate remedy

A trial court has discretion to fashion an appropriate remedy for a *Brady* violation within the bounds of reason. The magistrate judge has already continued the trial by approximately two months. Here, there was no violation, and even if there had been, the continuance sufficiently remedies any concerns. If Ranney needs yet more time to prepare his defense in light of disclosures following the July 27, 2026, continuance, the magistrate judge can continue the trial again. The proposed adverse jury instruction, however, constitutes an abuse of discretion.

*United States v. Garrison*, 888 F.3d 1057 (9th Cir. 2018), upon which the magistrate judge relied for its authority to impose the adverse jury instruction, does not actually support the giving of such instruction in this case. In *Garrison*, the government "made grave mistakes in its prosecution of the case by repeatedly failing to timely disclose information to the defense" both "[b]efore and *during* trial." 888 F.3d at 1061 (emphasis added). The government failed to inform defense that two government witnesses had helped falsify medical records, which it had learned about as to one witness months before trial, and which it learned during trial as to the other witness. *Id.* As to one of these witnesses, the government also failed to turn over documents related to plea negotiations until after her direct testimony. *Id.* at 1061-62. These *mid-trial* violations caused the government to dismiss two co-defendants, leaving Garrison as the only remaining defendant. Garrison argued that jurors were left with the clear implication that he was

guilty and therefore was not dismissed from the case. In light of these issues, which occurred in partial view of the jury, the Ninth Circuit found that the district court appropriately "instructed the jury by advising of the government's failure to timely comply with its constitutional obligations, and telling the jury that it could draw adverse inferences from this failure," and "that this consideration could lead the jury to find reasonable doubt as to Garrison's and his codefendants' guilt." *Id.* at 1063.

Even where *Brady* violations occur mid-trial, courts must ensure a tailored remedy to cure any potential prejudice. In *United States v. Dominguez*, the Ninth Circuit found no abuse of discretion where the district court refused to dismiss the indictment and determined that it could minimize any prejudice from "numerous *Brady*, *Giglio*, *Jencks* Act, and Rule 16 violations . . . by granting a continuance to allow the defense to review late-produced evidence, recalling government witnesses, instructing the jury why the trial was being delayed and the witnesses recalled, allowing the defense to give second opening statements after the government rested, and striking some of the government's key testimony." 641 F. App'x 738, 739 (9th Cir. 2016) (unpublished).

In *United States v. Garcia*, this Court found that the government had suppressed favorable evidence in the form of an admission by a cooperating witness that he had testified falsely before the grand jury. No. 18-cr-00466-BLF, 2022 WL 1801496 at *1 (N.D. Cal. June 2, 2022), *aff'd*, No. 22-10291, 2025 WL 314126 (9th Cir. Jan. 28, 2025). The Court stopped short of finding a *Brady* violation "because the Court provided immediate remedies to reduce or eliminate any prejudice to [the defendants]." *Id.* at *1-2. Those remedies included "allow[ing] Defendant's counsel ample opportunity to cross-examine [the cooperating witness] about his inaccurate grand jury testimony" in part by permitting defense counsel the ability to recall the witness for further cross-examination at a time of counsel's choosing. *Id.* at *1-2. Having found that defendants could not identify any prejudice that remained after those remedies, the Court denied the defendants' request for a *Brady* jury instruction. *Id.* at *3.

An instruction like that in *Garrison* is inappropriate here, where "the scope of the missing *Brady* evidence is now known and will be available to Ranney at trial." Dkt. 161 at 17–18. *Garrison*, *Garcia*, and *Dominguez* all involved instances of *mid*-trial disclosures where government witnesses had already testified before disclosures were made. Even so, the courts in *Garcia* and *Dominguez* fashioned remedies short of a *Garrison*-style instruction. Here, the disclosures will all have been made before trial. Similar

to the situation in *Garcia*, any prejudice Ranney may have suffered will be "drastically reduced or eliminated" by the time the trial starts, let alone by the time final jury instructions happen. As a result, a *Brady* instruction is unnecessary and invites the jury to render a verdict regardless of the facts and the law.

The contemplated instruction is especially problematic here, where the instruction will be untethered from context. The jury will hear that the government committed multiple constitutional violations and be left to speculate about how the government violated constitutional principles.

Even if this Court finds some of the recent disclosures favorable and admissible at trial, Ranney faces no prejudice, as he will have ample ability to examine witnesses and make associated arguments regarding credibility to the jury.

The contemplated jury instruction here does not remedy the alleged violations, but rather amounts to providing a directed verdict for the defense. It is not appropriate to inform the jury that the government has violated its constitutional obligations and that it may find reasonable doubt based on this alone, where Ranney is at perfect liberty to make any permissible use of the disclosures relating to Glumaz, Hall, and others in preparation for and/or at trial. A jury trial is supposed to be a search for the truth. *See United States v. Roberson*, 859 F.2d 1376, 1379 (9th Cir. 1988). The instruction ordered here would invite the jury to render a verdict regardless of the evidence; the Court should decline to allow this outcome when other, lesser remedies fully vindicate Ranney's rights.

**CONCLUSION**

For the foregoing reasons, this Court should reverse the magistrate judge's proposed remedy of a jury instruction that amounts to an instruction for a directed acquittal, and find that there was no *Brady* violation here.

DATED: September 23, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
E. WISTAR WILSON
ELI J. COHEN
Assistant United States Attorneys